**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| MATTHEW MCMILLAN, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No.: 3:20-cv-00319 |
| vs. | ) ) | |
| STUBHUB, INC., a Delaware Corporation, and LAST MINUTE TRANSACTIONS, INC., a Delaware Corporation, | ) ) ) | Honorable _____ |
| Defendants. | | |

## CLASS ACTION COMPLAINT AND JURY DEMAND

## INTRODUCTION

*"StubHub said they'd refund canceled tickets, but now they're taking that back –*
*StubHub is here for you. Unless you want a refund."*[1]

1.      Plaintiff Matthew McMillan ("Plaintiff"), by and through his counsel, files this Class Action Complaint against Stubhub, Inc., and Last Minute Transactions, Inc. (collectively "Defendants" or "StubHub"), on behalf of himself and on behalf of a class of similarly situated individuals, and alleges, upon personal knowledge as to his own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

2.      In the midst of the greatest public health and economic crisis in living memory, Defendants, which constitute a four-billion dollar enterprise, have sought to surreptitiously shift their losses onto their innocent customers, furthering the financial hardship endured by people across the country. Adding insult to injury, Defendants repeatedly claim to be doing this for the benefit and/or convenience of their now-disgruntled customers and refuse to take responsibility for the hardships that

---

[1] SBNation.com. March 28, 2020 (https://www.sbnation.com/2020/3/28/21198101/stubhub-refunds-canceled-event-ticket-nhl-nba-concerts) (last visited April 2, 2020).

they have created.

3.      Defendants own and operate the world's largest "secondary market" for event tickets. The market operates primarily through Defendants' website, www.Stubhub.com (the "Website").

4.      On the Website, sellers list tickets for sale to events such as sporting contests, theater shows, concerts, music festivals, and comedy shows. Buyers can find these listed tickets and purchase them directly though the Website. Defendants charge fees to both the buyers and sellers for their services.

5.      Plaintiff brings this action on behalf of himself and a class of similarly situated individuals who were deprived of the benefit of Defendants' longstanding "FanProtect" guarantee when, in response to apparent liabilities it would incur stemming from the COVID-19 pandemic, Defendants sought to retroactively discontinue the essential function of FanProtect, a cash refund.

6.      Defendants have quietly sought to force their buyers to endure the financial losses that Defendants' own guarantee created for Defendants in the entirely foreseeable scenario that world occurrences would cause the simultaneous cancellation of numerous public events.

7.      Instead of instituting responsible financial transaction policies, Defendants made it their practice to pay ticket sellers before the event had occurred, exposing themselves to the possibility that they would be left holding the bag (or have to ignore their own guarantee and cheat their customers) if an event was cancelled and they could not promptly collect from sellers.

8.      Defendants' uniform conduct is equally applicable to the class.  Plaintiff brings this class action against Defendants for: (1) breach of contract; (2) conversion; (3) negligent misrepresentation; (4) violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (5) violations of the unlawful prong California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. (the "UCL"); (6) violations of the unfair prong of the UCL; and (7) violations of California's False Advertising Law Cal. Bus. & Prof. Code § 17500, *et seq*. (the "FAL"). Plaintiff seeks an order requiring Defendants to, among other things: (1) reverse the unlawful changes they have sought to

make to their refund policy as it relates to tickets purchased prior to March 30, 2020; (2) prohibit Defendants from issuing coupons in lieu of refunds to any Class member who has not requested coupons; and (3) pay damages and restitution to Plaintiff and Class members.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from Defendants.  The number of members of the proposed class is in the aggregate greater than 100 and more than two-thirds of the class members reside in states other than the state in which Defendants are citizens.

10.      This Court has personal jurisdiction over Defendants because they conduct significant, substantial, and not-isolated business activities in Wisconsin and a substantial portion of the acts complained of took place in Wisconsin.

11.      Venue is proper in the Western District of Wisconsin because Defendants conduct business in this District and many of the events that gave rise to Plaintiff's claims occurred in this District.

## PARTIES

12.      Plaintiff Matthew McMillan is an individual and a citizen of Wisconsin.

13.      Defendant Stubhub, Inc. is a Delaware corporation with its principal place of business located in San Francisco, California.

14.      Defendant Last Minute Transactions, Inc. is a Delaware Corporation and a subsidiary and/or "affiliate" of Stubhub, Inc., with its principal place of business located in San Francisco, California. Along with StubHub, Inc., Last Minute Transactions, Inc. is a party to StubHub's contractual agreement with its users.

## FACTUAL ALLEGATIONS

15.     For years, in the process of building a marketplace in which consumers would be comfortable paying substantial prices, often beyond face-value, for event tickets from strangers on the internet, StubHub relied on its FanProtect guarantee, which was incorporated into its various user agreements and heavily marketed to prospective customers.

16.     Until March 25, 2020, the FanProtect guarantee promised that if a StubHub user purchased tickets to any event through Stubhub, and the event was cancelled, the user would receive a full, money-back refund for their purchase.

17.     StubHub has advertised the FanProtect guarantee heavily in internet and other media, including on its own Website and partner websites.

18.     Largely because of the guarantee, StubHub's users have been willing to pay premium prices for tickets and pay substantial fees directly to StubHub. A major component of StubHub's value is that refunds would be available for cancelled events and/or tickets that otherwise did not grant entry to a given event.

19.     In fact, in testimony given in February of 2020 to a United States House of Representatives subcommittee, StubHub's Vice President and General Counsel testified that "***StubHub's FanProtect guarantee is the hallmark of our business and why we have earned the trust of fans around the globe***."

20.     In early March, 2020, as the CODVID-19 pandemic spread, it became apparent that StubHub was looking for ways to avoid the liabilities its FanProtect guarantee would create for it in the event of mass-cancellations, and to pass the burden of those cancellations onto its customers.

21.     On or about March 12, 2020, StubHub sent its users an e-mail entitled "Coronavirus Update: We have your back[.]" The e-mail was addressed from and bore the signature of Sukhinder Singh Cassidy, StubHub's President. In it, StubHub insisted that refunds were still available for cancelled events but offered coupons for 120% of the original order price as an alternative.

22.     The March 12 e-mail stated "Dear [User], As a valued StubHub customer, I am personally reaching out to you regarding the current Coronavirus situation. We know it's an unsettling time for everyone and our hearts go out to those impacted…StubHub is here for you… If you buy tickets on StubHub to an event that is canceled, you have the option to receive a coupon worth 120% of your original order to go to the live event of your choosing within the next 12 months. Alternatively, you can choose to receive a full refund for the original order amount (including service and delivery fees) to the original payment method."

23.     On March 25, 2020, without delivering a corresponding e-mail to all users, StubHub changed the terms of its FanProtect guarantee on its website, now stating that "if the event is canceled and not rescheduled, you will get a refund or credit for use on a future purchase, as determined in StubHub's sole discretion (unless a refund is required by law)."

24.     Other StubHub communications made clear that no refunds would be offered, noting that in the event of a cancellation "[w]e'll give you a coupon worth 120% of your original order. You can apply this coupon toward multiple StubHub events in the same currency. It is valid for 1 year." Another communication, signed by Sukhinder Singh Cassidy, states without explaining the departure from prior assurances "When an event is canceled, you will receive a StubHub coupon worth 120% of your original order. For your convenience, we will directly add it to your StubHub account once the event is canceled."

25.     Remarkably, Ms. Cassidy had the temerity to explain that the theft of customers' money, which would be replaced only with unwanted coupons for unspecified events that may never happen given the uncertain state of the next 12 months, was being done for their "convenience[.]"

26.     Reports suggested that while StubHub is refusing to pay refunds to customers, it is not passing those "savings" onto the ticket sellers, who have in many or all instances been backbilled for the cancelled events.

27.     On March 27, 2020, in response to outrage about the purported policy changes, StubHub

tweeted that "[w]e appreciate our fans & want to create an offer of value given the difficult circumstances. To thank fans for their patience we are offering 120% credit. We will continue to provide refunds to buyers where required by law. This model is common practice in a number of industries."

28.     On March 30, 2020, StubHub finally sent an email, addressed from Ms. Cassidy, that directly informed its customers of the suspension of the longstanding refund policy. Rather than taking responsibility for its contractual obligations, StubHub through its President stated:

> We've worked hard to create a platform that serves both buyers and sellers as a trusted marketplace. As a convenience to buyers, acting as an intermediary, we've historically made the decision to refund them before collecting money from the seller. **We've also historically offered sellers more convenience by paying them for ticket sales on our platform before events actually happen. Under normal circumstances, these processes are manageable.**
>
> **Given the impact of the coronavirus, it is not possible to sustain this practice in the near-term.** We are facing significant timing delays in recouping funds from the thousands of sellers on our platform, and expect these challenges to continue in the coming months. At the same time, buyers expect immediate refunds. As a result, we've enacted new policies in the US and Canada that we believe are clear and fan-first.
>
> …
>
> We were the first in our industry to begin offering customers 120% credit for the canceled purchases as a thank you for remaining patient in a very challenging period. In the first two weeks of offering this option, approximately 70% of customers opted to receive this additional future value. **Recently, we announced this as our standard policy for canceled events, with refunds available in jurisdictions where they are required.** Coupons can be applied to one or multiple StubHub orders in the same currency. If your order is less than your coupon value, you can use the remainder on another event.

(emphasis added).

29.     StubHub's users have not at all agreed when being told yet again that this theft of their money was undertaken for their benefit or convenience. Their outraged responses to StubHub's March 27 tweet include:

> "Stubhub is clearly showing they don't give a [expletive] about the customer"
>
> "Well, you're stealing money from fans who purchased in good faith. My money spends well for much longer than the year expiration you place on your coupon. Crisis brings out the scammers[]"

"I ordered my tickets well before this policy… I won't be able to go so I want my money"
"I don't want a credit… I want my money back [and] the event is cancelled!! Y'all are [expletives]"

 "See you in court scumbags. I'm getting my cash back regardless"

"Cash doesn't have an expiration date so why does the useless refund coupon?"

"You should REALLY appreciate your customers and give them their money back in these tough economic times. Frankly, your COUPON policy is utter [expletive] and you should be ashamed."

"I don't want your [expletive] 120% credit. I want my [expletive] money back."

"You guys act like you can't weather this [expletive] storm like the rest of America."

"Dont try and pull your bull [expletive] by saying this is common law or practice. Most companies in your field are offering full refunds for the extenuating circumstances. You guys chose to be greedy and not consider your customers. Thank you for showing your true colors."

### *StubHub's User Agreement and The FanProtect Guarantee*

30. StubHub's website contains terms of service including a Global User Agreement and the FanProtect Guarantee. Various iterations of the terms have purported to bind users to them through assent when creating an account and/or with language substantially similar to the following: "By accessing or using our Site, You agree to be bound by this StubHub Marketplace Global User Agreement."

31. Each version of Defendants' User Agreements (including the version of Defendants' User Agreement that applies to the claims in this case) have explicitly incorporated the FanProtect guarantee into their terms as part of Defendants' "Additional Policies."

32. Defendants purport to retain the right to make changes to the User Agreement by "notify[ing] you by posting a revised version on our site and emailing you at your registered email address or otherwise notifying you via our site."

33. Separately, Defendants purport to retain the right to make changes to the Additional Policies "without prior notice and your continued use of the Site or Service constitutes your acceptance of the modified terms of the Additional Policies."

34.     Defendants provide yet a third set of criteria for amending their Agreement to Arbitrate[2], which states that "[w]e will notify you of amendments to the Agreement to Arbitrate by posting the amended terms on http://www.StubHub.com at least thirty (30) days before the effective date of the amendments and by sending notice to your email address on file with us."

35.     Defendants user agreements purport to bind the user to the agreement with both of the named Defendants.

36.     The operative version of the FanProtect guarantee, and the guarantee that had been in place until Defendants' sudden reversal, stated plainly that "[y]ou will be refunded if the event is cancelled and is not rescheduled."

37.     The term "[y]ou will be refunded if the event is cancelled and not rescheduled[]" is part of the contracts between Plaintiff and the Class on one hand and Defendants on the other.

38.     The modified version that Defendant now seeks to force upon Plaintiff and the Class states that "[i]f your event is canceled and not rescheduled, you will receive a coupon equal to the value of your original order."

39.     A section of the operative version of Defendants' User Agreement which purports to limit Defendants' liability expressly leaves in place liability created by the FanProtect guarantee, stating "to the maximum extent permitted by applicable law and except as specifically provided in this user agreement and in our FanProtect guarantee, we disclaim all warranties…"

40.     The version of Defendants' User Agreement that applies to the claims in this case does not contain a valid binding agreement to arbitrate their claims.

41.     The version of Defendants' User Agreement that applies to the claims in this case contains a choice-of-law provision requiring the application of California law to any disputes covered by the agreement. Defendants continue to represent that they will give actual refunds to customers in states where it is required by law. Upon information and belief, Defendants mean this to include California, Connecticut, Florida, Hawaii, Iowa, Maryland, Massachusetts, Minnesota, New Jersey, New York, Ohio, Rhode Island, Utah, and Virginia. But under Defendants' own terms and California

---

[2] The version of the Agreement to Arbitrate that would otherwise apply to the claims of Plaintiff and the Class is not valid or enforceable.

law, Defendants are required to provide these refunds *everywhere*.

42.     Defendants' wrongful acts and omissions occurred in California and were carried out and directed from Defendants' California headquarters by California personnel over California technological infrastructure.

### Defendants' Self-Imposed Liquidity Crisis

43.     As noted herein, Defendants' procedure for paying sellers for tickets before the event had occurred created an apparent shortage of operational cashflow for it, rendering it unable to honor its contractual obligations.

44.     Despite having recently been acquired for over 4 billion dollars, instead of obtaining liquidity to weather the storm, Defendants sought to simply pass its losses on to its clients.

45.     As noted by one media outlet in describing its "liquidity crisis," "Stubhub and competitor sites like Vivid Seats and Gametime allow brokers to collect proceeds from the sale of tickets after the transaction, instead of waiting until the event or concert took place. Anticipating a massive influx of requests for refunds, Stubhub has changed how brokers are paid …And instead of refunds, buyers of tickets for canceled events will now be given a credit on Stubhub for 120% of the original ticket, according to an email from a company representative. Only when "'required by law, we will provide refunds to buyers,' the spokesperson explained."[3]

46.     As noted in the March 30, 2020 e-mail, Defendants' prior practice was to pay sellers at the time of ticket delivery while still offering refunds to buyers when an event was cancelled. Defendants would then attempt to recoup the refunds from sellers.

47.     Contrary to Ms. Cassidy's representation in the March 30 e-mail, these refunds were not offered as a "convenience" to buyers, but rather were a key component of the contract between StubHub and its buyers, and the underlying feature of the heavily-advertised FanProtect guarantee. These refunds were not courtesies, they were and remain contractual obligations.

48.     As a result of Defendants' abrupt and illegal about-face, at least tens-of thousands of

---

[3] Billboard.com, "Amid Stubhub Layoffs & Liquidity Crisis, Ticket Brokers Push for a Bailout" (Mar. 26, 2020) https://www.billboard.com/articles/business/touring/9344129/stubhub-layoffs-liquidity-ticket-brokers-bailout (last visited April 1, 2020).

their customers have been and/or will be cheated out of refunds to which they are legally entitled for thousands of different events.

***Plaintiff's Use of StubHub***

49.     Plaintiff McMillan created a StubHub account prior to June of 2017.

50.     On June 1, 2017, StubHub notified Plaintiff McMillan by e-mail of an updated version of its User Agreement that would come into effect on July 1, 2017.

51.     In early March 2020, Plaintiff McMillan purchased two tickets to the March 20, 2020 National Hockey League ("NHL") game between the Winnipeg Jets and the Minnesota Wild. He paid approximately $120 dollars for the tickets.

52.     On March 12, 2020, the NHL suspended its season. While the remaining games, including the game for which Plaintiff McMillan purchased tickets through StubHub, could conceivably be rescheduled it remains all but a certainty that those games will be cancelled.

53.     After games were suspended, Plaintiff McMillan called StubHub's customer service, who told him that no refund of any kind could be issued because the game had not yet been technically cancelled, only postponed.

54.     StubHub's website, however, places NHL games in a different category than those which have been postponed and will be rescheduled. It refers to those games as "Events Under Review."

55.     Mr. McMillan now holds tickets to this game that has been effectively cancelled, will almost certainly be cancelled, and which he bought with a guarantee of a monetary refund for cancellation. But under StubHub's new policy without legal intervention, he will only be provided a coupon which expires within 12 months and not the refund to which he is entitled.

**<u>CLASS ALLEGATIONS</u>**

56.     Plaintiff brings this class action under Rule 23 and seek certification of the claims and issues in this action pursuant to the applicable provisions of Rule 23.  The proposed class is defined as:

> All persons residing in the United States or its territories who opened StubHub accounts before October 1, 2018 and used StubHub to purchase tickets to any event which was subsequently canceled or is canceled at any point from March 25, 2020 until the date that notice of this class action is disseminated to the Class, and to whom Defendants have not provided a refund. Excluded from the Class are (a) any person who has specifically requested a coupon in lieu of a refund; (b) all persons who are employees,

10

directors, officers, and agents of either Defendant; (c) governmental entities; and (d) the Court, the Court's immediate family, and Court staff.

57.     Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

58.     Numerosity.  Fed. R. Civ. P. 23(a)(1).  StubHub has stated that there are at least 23,000 events in the United States which have been cancelled, postponed, or rescheduled, and StubHub facilitates ticket sales to the vast majority of events in the United States to its more than 16 million users. At a minimum, there are tens of thousands of Class Members but very likely many more. The exact size of the proposed class and the identity of all class members can be readily ascertained from Defendants' records.

59.     Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members.  Common issues include:

      a.      Which version of Defendants' user agreement governs purchases made prior to March 25 and/or March 30, 2020;

      b.      Whether Defendants' user agreement contains a valid agreement to arbitrate claims and/or class action waiver;

      c.      Whether or the extent to which Defendants' statements and representations regarding the FanProtect guarantee are or constituted misrepresentations'

      d.      Whether Defendants' failure to issue promised refunds constitutes a breach of contract and/or conversion;

      e.      Whether Defendants knew or should have known that in the event of widespread event cancellations they would be unable to honor their FanProtect guarantee;

      f.      Whether Defendants' conduct is violative of the CLRA;

      g.      Whether Defendants' conduct is unfair or unlawful in violation of the Unfair Competition Law, California Business and Professions Code §17200, *et seq*.;

      h.      Whether Defendants' conduct constitutes untrue or misleading statements within the meaning of California Business and Professions Code § 17500, *et seq.*;

      i.      The nature of the relief, including equitable relief, to which Plaintiff and the class

are entitled.

60.     Typicality.  Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the Class he seeks to represent.  Plaintiff and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' unlawful conduct.

61.     Adequacy of Representation.   Fed. R. Civ. P. 23(a)(4).   Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Further, Plaintiff's counsel is competent and experienced in litigating class actions.

62.     Superiority.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to any other available means for the fair and efficient adjudication of this controversy.  The claims of Plaintiff and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendants, and it would be impracticable for class members to seek redress individually.  Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments.   Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendants' misconduct.  Class certification is therefore appropriate under Rule 23(b)(3).

63.     Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

64.     Class certification is also appropriate under Rule 23(b)(2), as Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

## FIRST CAUSE OF ACTION

### Breach of Contract – California Law

### Against Each Defendant

65.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

66.     A contract was formed between Plaintiff and Class members on the one hand and

Defendants on the other with respect to purchases made on Defendants' Website.

67.     The contract was offered by Defendants and formed at the time Plaintiff and the Class accepted it by creating their accounts. It was effectively modified most recently in July of 2017 after a June, 2017 notification to customers.

68.     The contract that governs the transactions at issue in this case includes the User Agreement and FanProtect guarantee that were operative as of July 1, 2017.

69.     Plaintiff and the Class performed their obligations under the contract.

70.     Defendants breached the contract when they ceased providing refunds to cancelled events as required under its terms.

71.     Defendants' breaches were willful and not the result of mistake or inadvertence.

72.     As a result of Defendants' breach of the FanProtect Guarantee, Plaintiff and other Class members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Conversion – California Law

### Against Each Defendant

73.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

74.     From the moment of cancellation, Plaintiff and the Class owned and had a right to possess funds in the amount that they paid for tickets to events that were cancelled.

75.     Defendants intentionally and substantially interfered with property belonging to Plaintiff and the Class by taking possession of it, refusing to refund it to Plaintiff, preventing Plaintiff and the Class from having access to it, and/or refusing to return it to Plaintiff after a demand was made for its return.

76.     Plaintiff and the Class did not consent to Defendants' conduct in withholding their funds.

77.     Plaintiff and the Class were harmed by Defendants' conduct.

78.     The conduct of each Defendant was a substantial factor in causing this harm to Plaintiff and the Class.

79.     As a result of Defendants' conduct, Plaintiff and other Class members have been

damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

**Negligent Misrepresentation – California Law**

**Against Each Defendant**

80.   Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

81.   Defendants represented to Plaintiff that a fact was true; namely, that if they purchased tickets through the Website, they would be able to get a refund if that event was cancelled.

82.   Defendants' representation was not true.

83.   Even if Defendants believed that the representation was true they had no reasonable grounds for believing that it was true when they made it given the potential for widespread cancellations due to any number of foreseeable circumstances.

84.   Defendants intended that Plaintiff and the Class would rely on their representation so that they would use the Website to purchase tickets.

85.   Plaintiff and the Class reasonably relied on Defendants' representations in using and making purchases on the Website.

86.   Plaintiff and the Class were harmed.

87.   Plaintiff's, and the Class' reliance on Defendants' representations was a substantial factor in causing their harm.

88.   As a result of Defendants' misrepresentation(s), Plaintiff and other Class members have been damaged in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

**Violation of Consumers Legal Remedies Act – Civil Code § 1750, *et seq.***

**Against Each Defendant**

89.   Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

90.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "CLRA") because Defendants' actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

91.   Plaintiff and each member of the Class are consumers as defined by California Civil

Code §1761(d).

92.     The tickets at issue herein are Goods within the meaning of Civil Code §1761(a) and Defendants' services are Services within the meaning of Civil Code §1761(b).

93.     Defendants violated the CLRA in at least the following respects:

        a.     In violation of Civil Code section 1770(a)(5), Defendants, by use of the untrue or misleading statements set forth and alleged in this complaint, represented that goods and/or services have characteristics or benefits which they do not have;

        b.     In violation of Cal. Civ. Code § 1770(a)(9), Defendants advertised its goods and/or services with the intent not to sell them as advertised (because it was obvious that under certain circumstances Defendants would not be able to honor its FanProtect guarantee).

        c.     In violation of Cal. Civ. Code § 1770(a)(14), Defendants represented that a transaction involves rights, remedies, and/or obligations which it does not have or involve.

        d.     In violation of Cal. Civ. Code § 1770(a)(16), Defendants represented that the subject of a transaction has been supplied in accordance with a previous representation (that refunds would be available) when it was not.

94.     Defendants knew, or should have known, that their representations and advertisements about the FanProtect guarantee were false or misleading.

95.     On or about the date of filing this action, Plaintiff notified Defendants in writing, by certified mail, of the violations alleged herein and demanded that Defendants remedy those violations.

96.     Plaintiff presently seeks only injunctive relief under this count. If Defendants fail to remedy the violations alleged herein within 30 days of receipt of Plaintiff's notice, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA.

97.     Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally and knowingly provided misleading information to the public.

## FIFTH CAUSE OF ACTION

### Unlawful Business Practices In Violation of Bus. & Prof. Code § 17200, *et seq.*

### Against Each Defendant

98.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

99.     Defendants' conduct constitutes unlawful business acts or practices under California's Unfair Competition Law, California Business & Professions Code § 17200, *et seq*. (the "UCL").

100.     Defendants' business practices are unlawful because, as detailed above, they constitute (1) a breach of the contract between Plaintiff and Class members on the one hand and Defendants on the other, (2) violations of the CLRA, (3) conversion; and/or (4) negligent misrepresentations.

101.     As a result of Defendants' unlawful business acts and practices, Plaintiff and other Class members have suffered injury in fact and lost money or property.

102.     Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendants not engaged in unlawful business practices and/or unfair competition, including by ordering restitution of all funds that Defendants may have acquired as a result of these practices and an injunction prohibiting further denials of refunds.

## SIXTH CAUSE OF ACTION

### Unfair Business Practices In Violation of Bus. & Prof. Code § 17200, *et seq.*

### Against Each Defendant

103.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

104.     The UCL proscribes unfair business acts or practices.

105.     A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.  A business act or practice is also "unfair" under the UCL if Defendants' conduct practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  A business act or practice is also "unfair" under the UCL where the consumer injury is substantial; the injury is not outweighed by any countervailing benefits to consumers or competition; and the injury is one that consumers themselves could not reasonably have avoided.

106.     Defendants' conduct as detailed herein constitutes unfair business acts and practices.

107.     Defendants enticed Plaintiff and the Class to use their services by representing that their purchases were protected by the FanProtect guarantee which would issue refunds in the event of cancellations, but no such refunds would be issued.

108.     Defendants charged fees in exchange for providing the FanProtect guarantee but the

guarantee was largely and ultimately illusory.

109.    Plaintiff and other Class members had no way of reasonably knowing that Defendants were charging them for a service that they would not honor or that they would be denied refunds that they were entitled to.

110.    The consequences of Defendants' conduct as detailed herein outweigh any justification, motive or reason for Defendants' conduct.  Defendants' conduct is and continues to be unlawful, immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff and members of the Class. Defendants' conduct has caused substantial injury to Plaintiff and other Class members, that injury is not outweighed by any countervailing benefits to consumers and Plaintiff and Class members could not have avoided such injury.

111.    As a result of Defendants' unfair business acts and practices, Plaintiff and other Class members have suffered injury in fact and lost money or property.  Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendants not engaged in unfair competition, including by ordering restitution of all funds that Defendants may have acquired as a result of these practices and an injunction prohibiting further denials of refunds.

<u>**SEVENTH CAUSE OF ACTION**</u>

<u>**False Advertising In Violation of Bus. & Prof. Code § 17500, *et seq.***</u>

**Against Each Defendant**

112.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

113.    Beginning at an exact date unknown to Plaintiff, but in any event within three years of the filing of this action case, and continuing to March 30, 2020, Defendants, with the intent to perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before Plaintiff and the putative class statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Defendants knew or reasonably should have known were untrue or misleading, in violation of Business and Professions Code section 17500, *et seq.*  Such statements include but are not limited to all of the representations set forth and discussed in the previous paragraphs

of this complaint, all of which are incorporated herein by this reference.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the class of similarly situated individuals, requests the Court to:

(a)     Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiff as representative of the class and designate counsel of record as class counsel;

(b)     Order Defendants to provide actual damages and equitable monetary relief (including restitution) to Plaintiff and class members and/or order Defendants to disgorge profits they realized as a result of their unlawful conduct;

(c)     Order Defendants to pay punitive damages, as allowable by law, to Plaintiff and class members;

(d)     Order Defendants to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and class members;

(e)     Declare Defendants conduct unlawful and enter an order enjoining Defendants from continuing to engage in the conduct alleged herein;

(f)     For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

(g)     For costs of the proceedings herein;

(h)     For reasonable attorneys' fees as allowed by statute; and

(i)     Award such other relief as the Court deems appropriate under the circumstances.

DATED:  April 2, 2020                                          Respectfully submitted,


                                                              **LIDDLE & DUBIN, P.C.**

                                                              s/ Nicholas A. Coulson

                                                              Steven D. Liddle
                                                              sliddle@ldclassaction.com
                                                              Nicholas A. Coulson
                                                              ncoulson@ldclassaction.com
                                                              975 E. Jefferson Avenue
                                                              Detroit, Michigan 48207

Tel: 313-392-0015
Fax: 313-392-0025

*Attorneys for Plaintiff and the Putative*
*Class*